Carroll
No. 2002-065

THE STATE OF NEW HAMPSHIRE

v.

ROBERT A. TIERNEY, JR.

Argued: September 11, 2003
Opinion Issued: December 19, 2003

*Peter W. Heed*, attorney general (*Ann M. Rice*, associate attorney general, on the brief and orally), for the State.

*Dawnangela Minton*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

BRODERICK, J. The defendant, Robert A. Tierney, Jr., appeals his multiple convictions for both aggravated felonious sexual assault, *see* RSA 632-A:2, X and XI (1986) (amended 1986, 1992, 1994, 1995), and felonious sexual assault, *see* RSA 632-A:3, III (1996), after a jury trial in the Superior Court (*T. Nadeau*, J.). On appeal, he argues that the Superior Court (*O'Neill*, J.) erred in denying his motion to sever the charges against him, which involved two young victims. He further contends that the Trial Court (*T. Nadeau*, J.) erred in precluding witness testimony about his character and in permitting a lay witness to testify as an expert. We reverse and remand.

I

The record supports the following facts. In 1984, the defendant, a lieutenant in the Wolfeboro Police Department, moved into the home of his fiancée, Paula Lewis. Lewis' two sons, W.P., then age 14, and R.J., then age 10, lived with her. In October 1984, the defendant and Lewis married. During the time he lived in Lewis' home, the defendant sexually assaulted both W.P. and R.J. on numerous occasions. Neither boy told their mother or each other about the assaults.

As a result of an incident involving the defendant and W.P. in the summer of 1984 and another involving R.J. in December 1987, Lewis became concerned that the defendant might be sexually assaulting her sons. She testified that she did not confront either the defendant or her sons after these incidents because she was unsure of what she had actually seen, was fearful of the defendant's position with the police department, and did not want to hurt her children. Lewis did, however, divorce the

defendant in the late 1980s because she believed he "was sexually molesting [her sons]."

In 1992 or 1993, in a letter to his mother, W.P. informed her of the sexual assaults committed by the defendant. In June 2002, R.J. reported his allegations involving the defendant to the Wolfeboro and State Police. Following a criminal investigation, the defendant was indicted for scores of sexual assaults against each boy.

Prior to trial, the defendant moved unsuccessfully to sever the charges, claiming that "the acts alleged, the manner and means, are completely separate and distinct for each complainant" and that joinder would jeopardize his right to a fair trial. During the trial, the State sought to prohibit three proposed defense witnesses from offering their opinions about the defendant's character for truthfulness. The defendant testified and denied the charged sexual assaults. Following cross-examination of the defendant, the trial court granted the State's motion because the defendant's character for honesty had not been sufficiently impeached to permit the proffered opinions.

Following Lewis' testimony, the prosecution called State Police Sergeant Thomas Yorke to testify about his criminal investigation. The defendant's motion to disallow a portion of the sergeant's testimony as improper expert testimony from a lay witness was denied. At the conclusion of a six-day jury trial, the defendant was convicted on all counts. This appeal followed.

The defendant argues that the trial court erred by: (1) denying his motion to sever "the unrelated sets of charges" involving both boys, pursuant to *State v. Ramos*, 149 N.H. 118 (2003); (2) preventing him from presenting "evidence about his character for truthfulness," under New Hampshire Rule of Evidence 608(a); and (3) allowing the State to present expert testimony through a lay witness.

## II

We turn first to the issue of severance. The defendant contends that the trial court erred in denying his motion to sever because the jury likely "decide[d] the cases on an improper basis and [was subjected to] the inherent prejudice of evidence of other wrongs." Specifically, the defendant argues that he had an absolute right to have the charges involving one boy severed from those involving the other because they were unrelated. He asserts that the trial court's failure to do so was *per se* prejudicial and not subject to a harmless error analysis. We note that the defendant does not make a constitutional argument under either our State or the Federal Constitution.

■ We will uphold a trial court's denial of a motion to sever unless we conclude that its ruling constituted an unsustainable exercise of discretion. *State v. Ramos*, 149 N.H. 118, 120 (2003). To show that a trial court's decision was unsustainable, a defendant must demonstrate that the ruling was clearly untenable or unreasonable to the prejudice of his case. *Id.* The focus of our inquiry, therefore, is whether the joinder of charges jeopardized the defendant's right to a fair trial. *Id.*

The trial court denied the defendant's motion to sever after reviewing the factors identified in *State v. Cote*, 129 N.H. 358, 367-68 (1987), and *State v. Fecteau*, 133 N.H. 860, 869 (1991). After we accepted the defendant's direct appeal, however, we issued our opinion in *Ramos*. In *Ramos*, we adopted the American Bar Association (ABA) standards for joinder and severance of criminal offenses for trial, which allow for joinder in all cases, but grant either the defense or prosecution "the absolute right to sever unrelated cases." *Ramos*, 149 N.H. at 127-28. We held that:

> Whenever two or more unrelated offenses have been joined for trial, the prosecuting attorney or the defendant shall have a right to [sever] them. "Unrelated" offenses are those that are not "related." "Related" offenses are those that are based upon the same conduct, upon a single criminal episode, or upon a common plan.

*Id.* at 128 (citations omitted).

The State concedes that if our ruling in *Ramos* governs the defendant's rights to severance, the cases should have been severed for trial. Additionally, the State concedes that if *Ramos* applies to this case, it cannot prove "harmless error." *See State v. Mason*, 150 N.H. 53, 62 (2003) (holding that misjoinder of criminal offenses is subject to harmless error analysis). The State does not contend that the charges involving each boy were related, nor does it argue that had the charges involving each boy been prosecuted in separate trials, the evidence involving the assaults against one boy would have been admissible in the trial involving the other under New Hampshire Rule of Evidence 404(b). Consequently, the only issue we need decide here is whether the joinder and severance standards we adopted in *Ramos* apply retroactively to a criminal case pending on direct appeal, where the issue of joinder or severance has been properly preserved. We hold that they do.

To decide the issue at hand, the defendant contends that we should follow *Griffith v. Kentucky*, 479 U.S. 314 (1987). *Griffith* concerned the retroactive application of *Batson v. Kentucky*, 476 U.S. 79 (1986). *Griffith*, 479 U.S. at 316. In *Batson*, the United States Supreme Court had ruled

that the defendant in a state criminal trial could establish a *prima facie* case of racial discrimination based on the prosecution's use of peremptory challenges to strike members of the defendant's race from the jury pool. *Id.* Further, once the defendant had made such a showing, the burden shifted to the prosecution to come forward with a neutral explanation for those challenges. *Id.* The Supreme Court held that "a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." *Id.* at 328. This holding supplanted the previous analysis of *Stovall v. Denno*, 388 U.S. 293 (1967), where the Supreme Court held that a determination regarding the retroactive effect of a newly announced rule of criminal procedure should be examined using a three-part test:

> (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards.

*Stovall v. Denno*, 388 U.S. 293, 296-97 (1967).

The State contends that we should retain the *Stovall* test, which we originally adopted in *State v. Shea*, 117 N.H. 1007, 1008 (1977). At the outset, we agree with the State that we are only bound to apply the *Griffith* test to rules of criminal procedure grounded in the United States Constitution. With regard to the retroactive or prospective effect of our decision in *Ramos*, a State case grounded upon State law, "[a] state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward." *Gt. Northern Ry. v. Sunburst Co.*, 287 U.S. 358, 364 (1932); *see State v. Tallard*, 149 N.H. 183, 185 (2003) ("state courts clearly can determine the retroactivity of their own decisions on state law issues").

We agree with the Supreme Court that the failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication: that once such a new rule has been announced, the integrity of judicial review requires that we apply the rule to all similar cases pending on direct review; and that "selective application of new rules violates the principle of treating similarly situated defendants the same." *Griffith*, 479 U.S. at 322-23.

> [I]t hardly comports with the ideal of administration of justice with an even hand, when one chance beneficiary—the lucky individual whose case was chosen as the occasion for announcing

the new principle—enjoys retroactive application, while others similarly situated have their claims adjudicated under the old doctrine. The fact that the new rule may constitute a clear break with the past has no bearing on the actual inequity that results when only one of many similarly situated defendants receives the benefit of the new rule.

*Id.* at 327-28 (citations and quotations omitted).

■We recognize that our adoption of the ABA standards in *Ramos* was not constitutionally mandated, but we disagree with the State that our purpose in adopting them was solely "supervisory in nature." Although the joinder rules themselves are not constitutional rights, misjoinder of charges may result in depriving a defendant of his fundamental right to a fair trial. *Mason*, 150 N.H. at 61. The rules are grounded in the bedrock constitutional mandate of a fair trial and it would be incorrect to characterize them as mere procedural rules.

■We adopt the rule enunciated in *Griffith*, as we believe it comports more appropriately with the fair and balanced administration of justice than the rule-specific *Stovall* analysis. Accordingly, the standards we adopted in *Ramos* apply retroactively here. *Cf. Estate of Ireland v. Worcester Ins. Co.*, 149 N.H. 656, 659-60 (2003) (in the context of a civil case or controversy, once a new rule of law has been applied retroactively, the rule must be applied retroactively to all cases thereafter, still open on direct review); *Tallard*, 149 N.H. at 186 (applying *Teague v. Lane*, 489 U.S. 288 (1989), to determine whether federal rule applies retroactively on State collateral review).

The State also contends that, by its plain language, our decision in *Ramos* was intended for prospective application only and, consequently, does not control the outcome of this case. Specifically, the State argues that our use of the word "henceforth" to preface the holding in *Ramos* indicates that our decision was not intended for retroactive application, *see Ramos*, 149 N.H. at 128. We disagree.

We do not believe that the word "henceforth," as used in *Ramos*, carries the degree of limitation ascribed to it by the State. First, whether or not the newly adopted ABA standards would have retroactive or prospective effect was not at issue in the case. In addition, the word prefaces a single sentence concerning two or more offenses committed by the same defendant, but the body of the sentence concerns only the ABA standard for joinder. *See id.* The following sentence, concerning the ABA standard for severance of two or more unrelated offenses, is prefaced by the more

inclusive word "whenever." *Id.* Further, notwithstanding our use of the word "henceforth," we applied the newly adopted rule to the defendant in *Ramos*. *Id.* Finally, the word lacks the degree of specificity we prefer when dealing with the issues of retroactive or prospective application of a rule. *See, e.g., Estate of Ireland,* 149 N.H. at 660; *Echo Consulting Services v. North Conway Bank,* 140 N.H. 566, 573 (1995); *State v. Hughes,* 135 N.H. 413, 420 (1992); *State v. Wonyetye,* 122 N.H. 39, 40 (1982). In sum, the import of the word "henceforth" in *Ramos* is miscast by the State.

■ Because we conclude that the standards we adopted in *Ramos* apply retroactively to criminal cases pending on direct appeal where the issue of joinder or severance has been raised in the trial court and properly preserved for appeal, *see Wonyetye,* 122 N.H. at 40, and in light of the State's concessions noted previously, we reverse the defendant's convictions and remand for further proceedings consistent with this opinion.

### III

Although we reverse the defendant's convictions on his first claim of error, we address his other claims in the interest of judicial economy to the extent they are likely to arise upon retrial. *See State v. Cressey,* 137 N.H. 402, 412 (1993).

The defendant argues that the trial court erred by not permitting him to present "evidence about his character for truthfulness," pursuant to New Hampshire Rule of Evidence 608(a) and *State v. Ross,* 141 N.H. 397 (1996). During trial, the State moved to prohibit such testimony. When the defendant testified, he denied having ever sexually assaulted either W.P. or R.J. At the conclusion of cross-examination, the trial court granted the State's motion because the defendant had not been sufficiently impeached to place his character for truthfulness at issue. *See State v. Ross,* 141 N.H. 397, 400-01 (1996).

■ We examine the trial court's ruling on the admissibility of evidence pursuant to Rule 608(a) under an unsustainable exercise of discretion standard. *State v. Berry,* 148 N.H. 88, 93 (2002). Rule 608(a) reads:

> (a) *Opinion and reputation of character.* The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) The evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is

> admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

"Character evidence in support of credibility is admissible under the Rule only after the witness' character has first been attacked .... The enormous needless consumption of time which a contrary practice would entail justifies the limitation." N.H. R. Ev. 608 Reporter's Notes (citations omitted).

The defendant argues that under *State v. Vachon*, 139 N.H. 540, 543 (1995), a defendant is permitted to present witnesses to testify "about his veracity" once a proper foundation is established. The defendant further asserts that because the State did not challenge his ability to do so, it was error to deny him "the opportunity to present evidence in the form of opinion or reputation concerning his credibility." We disagree.

The defendant's argument fails to recognize the limited scope of our review of Rule 608 in *Vachon*. There, the defendant argued that the trial court erred in admitting reputation evidence "because the prosecution failed to lay an adequate foundation for admissibility under [Rule] 608(a)(1)." *State v. Vachon*, 139 N.H. 540, 541 (1995). Rule 608(a)(2), and its mandate that evidence of truthful character is admissible *only after* a witness's character for truthfulness has been attacked, was not at issue in *Vachon*. Satisfying the requirement for a proper foundation, as explained in *Vachon*, does not negate the need to also satisfy the explicit mandate of Rule 608(a)(2). *See Ross*, 141 N.H. at 400-01.

The defendant also argues that the trial court erred in relying on *Ross* because *Ross* is "inapposite" to his case. We disagree. In *Ross*, we held that the trial court erred in allowing the State to present opinion or reputation testimony as to the complainant's truthful character because the defendant's cross-examination had not attacked the complainant's general character for truthfulness. *Id.* at 400-02. Noting that Rule 608(a) is identical to Federal Rule of Evidence 608(a), we looked to cases interpreting the federal rule to guide our decision. We cited with approval *United States v. Dring*, 930 F.2d 687, 691 (9th Cir. 1991), *cert. denied*, 506 U.S. 836 (1992), and stated:

> The purpose of Rule 608(a)(2) is to encourage direct attacks on a witness's veracity in the instant case and to discourage peripheral attacks on a witness's general character for truthfulness. To this end, the Rule prohibits rehabilitation by character evidence of truthfulness after direct attacks on a witness's veracity in the instant case. However, the Rule permits

rehabilitation after indirect attacks on a witness's general character for truthfulness.

. . . Arguing that the witness's testimony is not credible does not constitute an attack on the witness's reputation for truthfulness within the meaning of . . . Rule 608.

*Ross*, 141 N.H. at 400-01 (quotations, citations, brackets, and emphasis omitted).

██ Here, the trial court denied the defendant the opportunity to present evidence of his truthful character, not because he could not lay a proper foundation under Rule 608(a)(1), but because the State's cross-examination had attacked his credibility, not his general character for truthfulness. We find no unsustainable exercise of discretion in the trial court's ruling.

## IV

Finally, the defendant contends that the trial court erred by permitting the State to present expert witness testimony through a lay witness. Subsequent to Paula Lewis' testimony and cross-examination, the State called State Police Sergeant Thomas Yorke to testify about the criminal investigation he conducted into the charged sexual assaults. During the State's direct examination, the following exchange occurred:

Q. Okay. So it's not unusual for there to be sexual abuse of a child in a home?

A. No.

Q. Okay. And, in your experience, is it unusual for the eventual perpetrator to be an adult who resides in the home with the child?

A. That's not unusual.

Q. Okay. And in your experience, is it unusual that there might be a non-offending adult also living in the home when the child sexual abuse is taking place?

A. That's not unusual, either.

Q. Okay. And, in your experience, is it unusual for the non-offending adult in the home not to know what's going on?

A. That's not unusual.

The defendant objected and moved to strike the line of questioning, characterizing it as "inappropriate expert testimony" under *State v. Cressey*, 137 N.H. 402 (1993). The State countered that the testimony was "quasi-expert" and an appropriate response to Lewis' cross-examination, because she was "attacked . . . with great incredulity that she would allow this to go on, or that this could possibly go on when she was in the house or wouldn't know what was going on, wouldn't do anything about it." The trial court allowed the testimony to stand because the rules of evidence "permit a witness with experience to testify about their experience" and the State had not crossed the "fine line" of expert testimony under *Cressey*.

We limit our review to whether the trial court erred in admitting Sergeant Yorke's testimony regarding his experiences with child sexual abuse investigations. We review the trial court's ruling regarding the admissibility of Sergeant Yorke's testimony under our unsustainable exercise of discretion standard. *State v. Gonzalez*, 150 N.H. 74, 77 (2003).

The question of admissibility turns on the characterization of Yorke's testimony. *Id.* Expert testimony involves matters of scientific, mechanical, professional or other like nature, which requires special study, experience, or observation not within the common knowledge of the general public. *Id.* Lay testimony must be confined to personal observations that any layperson would be capable of making. *Id.* If Yorke's testimony is expert testimony, then it was not properly admitted as lay testimony; if it is not expert testimony, then it must be determined whether it is permissible lay testimony. *Id.*

Sergeant Yorke testified that he had investigated some 225-300 cases of sexual assault in his career. While his testimony was based on his personal observations while investigating those cases, his observations and conclusions regarding the usual or unusual nature of the location, the identity of the perpetrator, and the level of knowledge of a non-offending adult in child sexual assault cases required specialized training, experience and skill not within the ken of the ordinary person. *See id.* at 78. As such, Sergeant Yorke's testimony was expert testimony, and it was erroneously admitted as lay testimony. *See id.*

Because we reverse the defendant's convictions under our earlier *Ramos* analysis, we need not address the State's argument that the trial court's error was harmless. *See id.* at 79 (applying harmless error analysis to admission of expert testimony).

*Reversed and remanded.*

BROCK, C.J., and DALIANIS and DUGGAN, JJ., concurred.